J. Steven Sparks/Bar No. 015561
John C. Quinn/Bar No. 032231
**SANDERS & PARKS, P.C.**
3030 North Third Street, Suite 1300
Phoenix, AZ  85012-3099
 Firm E-mail:  minutes@sandersparks.com

J. Steven Sparks
 Direct Phone: 602.532.5769
  E-Mail: steve.sparks@sandersparks.com

John C. Quinn
 Direct Phone: 602.532.5631
 Direct Fax: 602.230.5079
 E-Mail: John.Quinn@SandersParks.com

*Attorneys for Plaintiff Texas Insurance Company*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Texas Insurance Company, a Nebraska company,<br><br>                    Plaintiff,<br><br>v.<br><br>A.R. Mays Construction, Inc., an Arizona corporation; Trimod Aileron Property LLC, a Delaware limited liability company; Moderne Capital Partners II, LLC d/b/a Hyphen Capital Partners II, LLC, a Delaware limited liability company; Jared Black and Jane Doe Black; David Dewar and Jane Doe Dewar; Les Litwin and Jane Doe Litwin; and Jeffrey Stone and Jane Doe Stone,<br><br>                    Defendants. | Case No.:_____<br><br>**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** |

Plaintiff Texas Insurance Company ("TIC") by and for its Complaint hereby alleges as follows:

## NATURE OF THE ACTION

1.    This is a civil action for declaratory relief through which TIC seeks a declaratory judgment, under 28 U.S.C. § 2201, *et seq.,* that the commercial general liability policy, No. TI22PWUP-01481-01, effective from to March 1, 2022 to December 15, 2024 (the "Policy"), issued to the first Named Insured Trimod Aileron Property LLC ("Trimod") provides no coverage for the claims and damages sought by Trimod against Defendants A.R. Mays Construction, Inc., Moderne Capital Partners II, LLC, Jared Black and Jane Doe Black, David Dewar and Jane Doe Dewar, Les Litwin and Jane Doe Litwin, and Jeffrey Stone and Jane Doe Stone in the following actions currently pending: (1) in the Superior Court of Arizona for Maricopa County entitled *A.R. Mays Construction, Inc. v. Trimod Aileron Property LLC, et al.*, Case No. CV2025-019644, consolidated with Case No. CV2025-015508 (the "ARM Lawsuit"); (2) in the Superior Court of Arizona for Maricopa County entitled *Trimod Aileron Property LLC v. Moderne Capital Partners LLC, et al.*, Case No. CV2024-022920 (the "Moderne Lawsuit"); and (3) in the arbitration currently pending before the American Arbitration Association ("AAA"), Case No. 01-25-0003-2807 (the "Arbitration").

2.    Through this action, TIC seeks a determination that TIC has no indemnity or defense obligations towards Defendants A.R. Mays Construction, Inc., Moderne Capital Partners II, LLC, Jared Black and Jane Doe Black, David Dewar and Jane Doe Dewar, Les Litwin and Jane Doe Litwin, and Jeffrey Stone and Jane Doe Stone, or any other claimed insured or assignee of any insured's rights.

## PARTIES, JURISDICTION AND VENUE

3.    Plaintiff TIC is a Texas admitted-insurance carrier with its principal place of business in the State of Nebraska and is, therefore, a citizen of Nebraska and Texas as defined by 28 U.S.C. § 1332(c)(1).

4.    Defendant A.R. Mays Construction, Inc. ("ARM") is an Arizona corporation with its principal place of business in Arizona and is, therefore, a citizen of Arizona as defined by 28 U.S.C. § 1332(c)(1).

5.      Defendant Trimod is and was, at all relevant times, a Delaware limited liability company conducting business in Arizona. Upon information and belief, the sole member of Trimod is Trimod Aileron Investment, LLC. Upon information and belief, Trimod Aileron Investment, LLC is and was, at all relevant times, a Delaware limited liability company conducting business in Arizona. Therefore, Trimod is a citizen of Arizona and Delaware as defined by 28 U.S.C. § 1332.

6.      Defendant Moderne Capital Partners II, LLC ("MCP II") is and was, at all relevant times, a Delaware limited liability company conducting business in Arizona, and has a principal address located at 1641 E. McDowell Road in Phoenix, Arizona. Upon information and belief, the sole member of MCP II is Moderne Real Estate Partners I, LLC. Upon information and belief, Moderne Real Estate Partners I, LLC is and was, at all relevant times, a Delaware limited liability company conducting business in Arizona. Therefore, MCP II is a citizen of Arizona and Delaware as defined by 28 U.S.C. § 1332.

7.      Upon information and belief, Defendant Jared Black is a resident and citizen of Arizona, and conducted business and/or committed actions in Arizona relevant to the Moderne Lawsuit. Jane Doe Black is a fictitious defendant named in the event that Jared Black is married. At all times, and upon information and belief, Jared Black was acting on behalf of their marital community.

8.      Upon information and belief, Defendant David Dewar is a resident and citizen of Arizona, and conducted business and/or committed actions in Arizona relevant to the Moderne Lawsuit. Jane Doe Dewar is a fictitious defendant named in the event that David Dewar is married. At all times, and upon information and belief, David Dewar was acting on behalf of their marital community.

9.      Upon information and belief, Defendant Les Litwin is a resident and citizen of Arizona, and conducted business and/or committed actions in Arizona relevant to the Moderne Lawsuit. Jane Doe Litwin is a fictitious defendant named in the event that Les Litwin is married. At all times, and upon information and belief, Les Litwin was acting on behalf of their marital community.

10.     Upon information and belief, Defendant Jeffrey Stone is a resident and citizen of Arizona, and conducted business and/or committed actions in Arizona relevant to the Moderne Lawsuit. Jane Doe Stone is a fictitious defendant named in the event that Jeffrey Stone is married. At all times, and upon information and belief, Jeffrey Stone was acting on behalf of their marital community.

11.     Upon information and belief, all acts described herein occurred in Maricopa County, State of Arizona.

12.     The amount in controversy in this action exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Notably, Trimod seeks to collect alleged damages in excess of $25,000,000 from Defendant ARM in connection with the ARM Lawsuit and the Arbitration. In addition, Trimod also separately seeks to collect alleged damages in excess of $25,000,000 from Defendants MCP II, Jared Black and Jane Doe Black, David Dewar and Jane Doe Dewar, Les Litwin and Jane Doe Litwin, and Jeffrey Stone and Jane Doe Stone, in connection with the Moderne Lawsuit and the Arbitration.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because the events giving rise to this action occurred in this District.

14.     An actual case or controversy has arisen between the parties because Defendant ARM has tendered the defense and indemnity of the ARM Lawsuit and Arbitration to TIC. TIC has accepted the defense subject to a full and complete reservation of rights. As such, an actual controversy exists that requires a judicial declaration to determine the respective rights and obligations of the parties.

15.     An actual case or controversy has also arisen between the parties because Defendants MCP II, Jared Black, David Dewar, Les Litwin, and Jeffrey Stone have tendered the defense and indemnity of the Moderne Lawsuit and Arbitration to TIC. TIC has accepted the defense subject to a full and complete reservation of rights. As such, an actual controversy exists that requires a judicial declaration to determine the respective rights and obligations of the parties.

**GENERAL ALLEGATIONS**

16.    TIC incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

**A.    THE PROJECT.**

17.    On or about February 23, 2022, ARM, as general contractor, and Trimod, as Owner, entered into AIA Document A102-2017 Standard Form of Agreement Between Trimod and ARM (the "ARM Contract").

18.    Per the ARM Contract, ARM agreed to serve as the general contractor on a construction project located at 20350 North 7th Avenue in Phoenix, Arizona (the "Project").

19.    The Project consists of eleven residential apartment buildings (with 287 units) and common area appurtenances.

20.    On March 1, 2022, Trimod and MCP II entered into a formal Project Management Services Agreement (the "Moderne Contract").

21.    Under the Moderne Contract, Trimod engaged MCP II to provide professional project management and development services as the Construction Manager relating to the Project.

22.    Section 1.1 of the Moderne Contract required, among other things, MCP II to "perform all of the services, and in such phases, as are set forth in this Section 1, together with such other services in connection therewith as are customarily furnished as basic services in accordance with generally accepted project management practice ('Basic Services').".

23.    Section 1.2 of the Moderne Contract required MCP II to provide its services "as expeditiously as is consistent with professional skill and care and the orderly progress of the Project and in accordance with the professional standard of care, skill and diligence customarily followed by project management professionals on projects of comparable scope and quality to the Project."

24.    Section 1.3 of the Moderne Contract detailed different phases of construction and services MCP II was required to perform overall, and during each phase, as noted in subsections 1.3(a)-(ee).

25.     Under the Moderne Contract, MCP II's agreed upon services also included, but were not limited to the following:

- ". . . pre-construction coordination and evaluation . . ."
- ". . . shall monitor the work of the Contractor and to coordinate the work of the Contractor . . ."
- "shall schedule and conduct meetings, with [Trimod] and such other parties as [Trimod] may direct after consultation with [Trimod], not less often than once per week to discuss such matters as procedures, progress and scheduling."
- ". . . shall provide and maintain a competent, full-time management team on the Project site . . ."
- ". . . shall endeavor to obtain satisfactory performance from each of the Contractor and Subcontractors."
- ". . . shall establish a comprehensive quality control and inspection program to assure that Work is performed in accordance with the drawings, specifications, and other Contract Documents."
- ". . . endeavoring to guard [Trimod] against defects and deficiencies in the Work."
- ". . . shall reject any portion of the Work . . . when it is the opinion of the Consultant, [Trimod], or Architect that such Work does not conform to the requirements of the Contract Documents."
- ". . . shall establish and implement procedures for expediting the processing and approval of Shop Drawings, Product Data, Samples and other submittals in cooperation with the Architect."
- ". . . shall render to [Trimod] its informed judgement whether and when the Project and Contractor's and each Subcontractor's Work has been substantially completed in accordance with the Contract Documents."
- ". . . shall continuously monitor the approved estimate of Construction Cost."
- ". . . shall develop and implement procedures for the review and processing of applications by Contractor for progress and final payments."
- " . . . shall review requests for changes, assist in negotiating Contractor's proposals, submit recommendations to Architect and [Trimod], and, if they are accepted, prepare Change Orders. [MCP II] shall establish and implement a change order control system. Any changes to the Contract between [Trimod] and Contractor shall be made only by change orders which have been executed by [Trimod]."

26.     Furthermore, Subsection 1.3 (ee) of the Moderne Contract, entitled "warranties," states that "[MCP II] shall secure the warranties and similar submittals required by the Contract Documents for delivery to [Trimod] and ensure the delivery of all keys, manuals, record drawings and maintenance stocks to [Trimod]."

27.     Section 3.2 of the Moderne Contract, entitled "timely performance" states that "[MCP II's] Basic Services and Additional Services shall be performed in a timely manner so as not to cause any delay in starting construction of the Project and otherwise in accordance with the Project schedule set forth by [Trimod]."

28.     Upon information and belief, the City of Phoenix issued a building permit for the Project on March 29, 2022.

29.     Upon information and belief, Trimod and/or its agents visited the Project throughout the course of construction and claim to have documented numerous construction defects or instances of faulty workmanship prior to December 15, 2024.

30.     Upon information and belief, the City of Phoenix did not issue a final certificate of occupancy covering the entire "Designated Project Site," as that term is defined in the Policy, on or before December 15, 2024.

31.     On December 20, 2024, ARM sent a letter to Trimod advising that it was stopping work on the Project.

32.     Trimod alleges that the Project was still incomplete as of December 23, 2024.

**B.     THE MODERNE LAWSUIT.**

33.     On August 22, 2024, Trimod filed a Complaint ("Trimod's Complaint") against Moderne Capital Partners LLC; Moderne Capital Partners II, LLC a/k/a/ Hyphen Capital Partners II, LLC; Jared Black and Jane Doe Black; David Dewar and Jane Doe Dewar; Les Litwin and Jane Doe Litwin and Jeffrey Stone and Jane Doe Stone[1] alleging: (1) Breach of Agreement; (2) Breach of Implied Covenant of Good Faith and Fair Dealing; and (3) Negligence. A copy of the Trimod Complaint is attached as **Exhibit 1** ("Compl.").

---

[1] Defendants Moderne Capital Partners II, LLC a/k/a Hyphen Capital Partners II, LLC; Jared Black and Jane Doe Black; David Dewar and Jane Doe Dewar; Les Litwin and Jane Doe Litwin and Jeffrey Stone and Jane Doe Stone are hereinafter collectively referred to as the "MCP II Defendants."

34. Trimod's Complaint alleges that MCP II breached the Moderne Contract by, among other things:

- Failing to "perform all of the services, and in such phases, as are set forth in this Section 1, together with such other services in connection therewith as are customarily furnished as basic services in accordance with generally accepted project management practice." (Compl., ¶ 14). This is allegedly a breach of § 1.1 of the Moderne Contract. (Compl., ¶ 32).
- Failing "to provide its services 'as expeditiously as is consistent with professional skill and care and the orderly progress of the Project and in accordance with the professional standard of care, skill and diligence customarily followed by project management professionals on projects of comparable scope and quality to the Project.'" (Compl., ¶ 15). This is allegedly a breach of MCP II's obligations under the Moderne Contract as detailed in § 1.2. (Compl., ¶ 32).
- Failing to "have a competent, full-time management team on site to arrange for the performance of the work in the most expeditious and economical manner consistent with good workmanship, sound business practices, and the best interests of Plaintiff." (Compl., 21). This is allegedly a breach of MCP II's obligations under the Moderne Contract as detailed in § 1.3(e). (Compl., ¶ 20).
- Failing to "have comprehensive quality control and inspection program to assure that the Work is performed in accordance with the drawings, specifications, and other Contract Documents." (Compl., ¶ 23). This is allegedly a breach of MCP II's obligations under § 1.3(q) of the Moderne Contract. (Compl., ¶ 22).
- "Approv[ing] or otherwise accept[ing] work not conforming with the requirements of the Contract Documents." (Compl., ¶ 24). This is allegedly another breach of MCP II's obligations under § 1.3(q) of the Moderne Contract. (Compl., ¶ 25).
- Failing to "appropriately document changes to the Contract [Agreement] with the General Contractor by way of Change Order." (Compl., ¶ 27). This is allegedly a breach of MCP II's obligations under § 1.3(u) of the Moderne Contract. (Compl., ¶ 26).
- Failing to "secure warranties required by the Contract [Agreement] Documents, including but not limited to waiving the flooring warranty." (Compl., ¶ 29). This is allegedly a breach of MCP II's obligations under § 1.3(ee) of the Moderne Contract. (Compl., ¶ 28).
- "Caus[ing] delay to the Amelia, as the project is still not complete and is a year behind schedule." (Compl., ¶ 31). This is allegedly a breach of MCP II's obligations under § 3.2 of the Moderne Contract. (Compl., ¶ 30).

35. Trimod's Complaint also alleges that MCP II breached the implied covenant of good faith and fair dealing by: "among other things, failing to provide sufficient and qualified personnel to perform its obligations, manage and ensure timely completion of the Amelia." (Compl., ¶ 40).

36. With respect to negligence, Trimod's Complaint alleges that Moderne Capital Partners, LLC (not MCP II), Jared Black, David Dewar, Les Litwin, and Jeffrey Stone were negligent because they "failed to perform their services with professional skill, care, and diligence, thereby breaching their duty to Plaintiff, and causing Plaintiff to incur significant damages in an amount to be proven at trial." (Compl., ¶ 45).

37. However, Trimod's Complaint does not contain any specific allegations as to what constituted negligence in that matter.

38. Upon information and belief, in connection with its claims against the MCP II Defendants seeks to recover the following damages: (1) cost of repairs totaling $25,582,014.35; (2) loss of use/rent totaling $5,000,000.00; (3) liquidated damages totaling $500,000; (4) attorneys' fees and costs; and (5) expert costs.

39. Upon information and belief, on December 10, 2025, the Superior Court in the Moderne Lawsuit granted the parties' "Stipulation to Submit the Dispute to Private Arbitration and Stay."

**C.    THE ARM LAWSUIT.**

40. On June 4, 2025, ARM filed suit in Maricopa County Superior Court against Trimod for Breach of Contract and Unjust Enrichment.

41. Upon information and belief, ARM filed an Arbitration Demand with the AAA in July of 2025.

42. On August 4, 2025, Trimod filed an Answer and Counter-Claim against ARM in the Arbitration for "construction defects, delays, loss of use, lost rents, failure to defend and/or pay mechanic's and materialman's liens."

43. On September 24, 2025, Trimod filed an Answer and Counter-Claim ("Trimod's Counterclaim) in the ARM Lawsuit asserting four causes of action as follows: Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, A.R.S. § 33-420(A) for recording an allegedly invalid lien, and A.R.S. § 33-420(C). A copy of Trimod's Counter-Claim is attached as **Exhibit 2**.

44. Trimod's Counterclaim alleges that ARM breached the ARM contract by "(1) failing to pay its subcontractors; (2) failing to defend against mechanic's and materialman's liens recorded against the Subject Property by ARM's subcontractors; (3) failing to timely complete its work; (4) performing deficient and defect (*sic*.) work; (5) mismanaging the project; (6) failing to mitigate project costs; and, (7) inflating project costs."

45. On January 5, 2026, the Superior Court granted ARM's "Motion to Compel Arbitration."

46. Upon information and belief, in connection with its claims against Defendant ARM, Trimod seeks to recover the following damages: (1) cost of repairs totaling $25,582,014.35; (2) loss of use/rent totaling $5,000,000.00; (3) liquidated damages totaling $500,000; (4) attorneys' fees and costs; and (5) expert costs.

**D.      The TIC Policy.**

47. TIC issued a commercial general liability policy to named insured Trimod Aileron Property, LLC bearing policy number TI22PWUP-01481-01, with an original policy period of March 1, 2022 to September 1, 2024, extended to December 15, 2024 (the "Policy").  A copy of the Policy is attached as **Exhibit 3.**

48. The Policy provides liability coverage to the insured with a policy limit of $2,000,000 per occurrence, a $2,000,000 General Aggregate limit, and a $2,000,000 "products-competed operations hazard" Aggregate limit, subject to the terms, conditions, exclusions, and definitions in the Policy.

49. The Policy was amended by the "Named Insured - Schedule" endorsement to add ARM and MCP II as named insureds.

50. The Policy was further amended by the "Wrap-Up Amendatory" endorsement to define the "Designated Project Site" as "the project identified and described in the Schedule of this endorsement."

51. In the Schedule, the project was identified as "20350 N 7th Ave, Phoenix, AZ 85027" and described as: "CCIP: ground up construction of eleven 2-3 story garden-style apartments with 287 units."

52. The Policy provides in the insuring agreement, in relevant part, as follows:

> Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.
> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.
> The word "insured" means any person or organization qualifying as such under Section **II —** Who Is An Insured.
> Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** —Definitions.
>
> **SECTION I – COVERAGES**
> **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
> **1. Insuring Agreement[2]**
> **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:
> > **(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and
> > **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or

---

[2] 2 As modified by ASG 09 09 09 21 – **WRAP-UP AMENDATORY ENDORSEMENT.**

settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place at the "Designated Project Site."

**(2)** The "bodily injury" or "property damage" occurs during the policy period, except for "bodily injury" or "property damage" included in the "products-completed operations hazard". For "bodily injury" or "property damage" included in the "products-completed operations hazard" the "bodily injury" or "property damage" occurs during the policy period or during the "extended products-completed operations period.

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**(4)** And with respect to the "products-completed operations hazard" only, the "Designated Project Site" has been issued a final certificate of occupancy prior to the expiration of the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(**2**) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(**3**) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

53. The Policy provides, under Section II – Who Is An Insured, in relevant part, as follows:

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is also an insured:[3]

**a.** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" are insureds for:

(**1**) "Bodily injury" or "personal and advertising injury":

(**a**) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the

---

[3] As modified by ASG 03 12 10 21 – **AMENDMENT – WHO IS AN INSURED ENDORSEMENT.**

course of his or her employment or performing duties related to the conduct of your business.

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(1) (a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

Subparagraphs (a), (b) and (c) above do not apply to any "employees" who are "executive supervisors".

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**c.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

54. The Policy also states, under Section III – Limits of Insurance, in relevant part, as follows:

**SECTION III - LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:
  **a.** Insureds;
  **b.** Claims made or "suits" brought; or
  **c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:
  **a.** Medical expenses under Coverage **C;**
  **b.** Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and
  **c.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph 2. above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:
  **a.** Damages under Coverage A; and
  **b.** Medical expenses under Coverage C because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional

- 15 -

period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**LIMITS OF INSURANCE:[4]**
The General Aggregate Limit as defined by Paragraph **2.** of this Section and identified in Item **5.** of the Commercial General Liability Declarations will reinstate on:
> 1) 06/01/2023

A separate General Aggregate Limit will apply to all "bodily injury" and "property damage" that occurs before 06/01/2023 and all "bodily injury" or "property damage" that takes place after 06/01/2023.
Under no circumstances will the Products/Completed Operations Aggregate Limit reinstate.

55.    The Policy also states, under Section IV – Commercial General Liability Conditions, in relevant part, as follows:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS[5]**
* * *

**4. Other Insurance**
If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:
**a. Primary Insurance**
This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.
**b. Excess Insurance**
   **(1)** This insurance is excess over:
    **(a)** Any of the other insurance, where primary, excess contingent or on any other basis:
      **(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk, Construction All Risks (CAR), Erection All Risks, (EAR), Course of Construction (COC), Delay in Completion, Delay in Start Up (DSU), property inland marine, or similar coverage for "your work."
* * *

---

[4] As added by ASG 09 11 01 21 – **GENERAL AGGREGATE LIMIT REINSTATEMENT ON 06/01/23.**
[5] As modified by ASG 03 04 09 20 – **AMENDMENT OF OTHER INSURANCE PROVISION – EXCESS INSURANCE ENDORSEMENT.**

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

    **(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

    **(b)** The total of all deductible and self-insured amounts under all that other insurance.

56.    The Policy also states, under Section V – Definitions, in relevant part, as follows:

* * *

**5.** "Employee" includes a "leased worker" and "temporary worker".[6]

**6**. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

* * *

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

    **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    **b.** You have failed to fulfill the terms of a contract or agreement; if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

* * *

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business.

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.[7]

    With respect to coverage provided within the "products-completed operations hazard", "occurrence" is also defined to include "property dam-age" or "bodily injury" caused by defective construction or faulty workmanship, but only to the extent:

---

[6] As modified by ASG 03 13 09 20 - **AMENDMENT OF DEFINITION – EMPLOYEE.**

[7] As modified by ASG 03 05 09 20 – **DEFINITION OF OCCURRENCE ENDORSEMENT**.

**(1)** such "property damage" or "bodily injury" results from defective construction or faulty workmanship;

**(2)** such "property damage" or "bodily injury" was unexpected or unintended from the standpoint of the insured; and

**(3)** "your work" was performed pursuant to a written contract

The definition of "occurrence" does not include damage to, replacement of, or repair of the defective construction or faulty workmanship itself, nor the labor or materials necessary to repair or re-place the same. The definition of "occurrence" does include costs incurred for accessing, removing or replacing any non-defective or non-faulty work, but only to the extent such costs arise out of a claim for "property damage" that is covered by this Policy.

\* \* \*

**16.** "Products-completed operations hazard":

The "products-completed operations hazard" shall include all "bodily injury" and "property damage" occurring at the "Designated Project Site" after a final certificate of occupancy has been issued for the "Designated Project Site." Coverage under the "products-completed operations hazard" will not trigger for the "Designated Project Site" if a final certificate of occupancy is not issued prior to the expiration of the policy period.

The "products-completed operations" hazard may trigger where work may need service, maintenance, correction, repair or replacement, but where a final certificate of occupancy for the "Designated Project Site" has been issued.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

\* \* \*

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

\* \* \*

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

\* \* \*

"Extended products-completed operations period" means the period commencing on the date "products-completed operations" coverage is triggered under this Policy through any applicable statute of limitation or statute of repose that applies at policy inception. The "extended products-completed operations period" shall not take effect

is this Policy is cancelled for any reason or expires prior to the trigger of "products-completed operations" coverage. [8]

57.    The Policy also contains several exclusions, which, in relevant part, state as follows:

**SECTION I – COVERAGES**
**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
* * *
**2. Exclusions**
This insurance does not apply to:
**a. Expected Or Intended Injury**
 "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.
**b. Contractual Liability**
 "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
 **(1)** That the insured would have in the absence of the contract or agreement; or
 **(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:
  **(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and
  **(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.
* * *
**m. Damage To Impaired Property Or Property Not Physically Injured**

---

[8] Added by ASG 09 09 09 21 – **WRAP-UP AMENDATORY ENDORSEMENT.**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

\* \* \*

"Property damage" to personal property in the care, custody or control of any insured.[9]

58. The Policy contains a "Property Damage to the Designated Project Site During the Course of Construction" endorsement that provides as follows:

This insurance does not apply to any "property damage" to the "Designated Project Site" that occurs during the course of construction. The "Designated Project Site" will be deemed to be within the course of construction until "your work" is deemed completed in accordance with the definition of "products-completed operations hazard" within this Policy.

59. The Policy contains a "Construction Management Errors and Omissions" endorsement that provides as follows:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

**1.** The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change

---

[9] As modified by ASG 09 09 09 21 – **WRAP-UP AMENDATORY ENDORSEMENT.**

orders or drawings and specifications by any architect, engineer or surveyor performing services on a project on which you serve as construction manager; or

**2.** Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved that which is described in Paragraph 1. or 2.

This exclusion does not apply to "bodily injury" or "property damage" due to construction or demolition work done by you, your "employees" or your subcontractors.

60. The Policy contains an "Exterior Insulation and Finish Systems" endorsement that provides as follows:

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

**1.** The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

**2.** "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

**1.** A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

**2.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**3.** A reinforced or unreinforced base coat;

- 22 -

**4.** A finish coat providing surface texture to which color may be added; and

**5.** Any flashing, caulking or sealant used with the system for any purpose.

61.    The Policy contains a "Cross Suits Liability" endorsement that provides as follows:

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages – Coverage A – Bodily Injury And Property Damage Liability:**
This insurance does not apply to:
**Cross Suits**
Any claim made or "suit" brought by any Named Insured under this Policy against another Named Insured under this Policy for damages because of "property damage".
However, this exclusion shall not apply to any claim made or "suit" brought by any designated entity within the Schedule below against another Named Insured: **A. R. Mays Construction, Inc.; Trimod Aileron Property, LLC.**

62.    The Policy contains a "First Named Insured's Rights and Duties" endorsement that provides, in part, as follows:

The following Condition is added to **Section IV - COMMERCIAL GENERAL LIABILITY CONDITIONS:**

This Policy provides commercial general liability coverage as part of a Controlled Insurance Program. The First Named Insured under this Policy is: Trimod Aileron Property, LLC.
It is agreed by all insureds that the First Named Insured has responsibilities for and will act on behalf of all insureds with respect to the following:
    1. Changes/amendments to this Policy;
    2. Premium payments;
    3. Premium audits
    4. QAQC compliance;
    5. Wrap administration compliance
    6. Receiving return premium;
    7. Risk Management compliance
    8. Giving or receiving notice of cancellation;
    9. Claim notices; and
    10. Claim information

63. In addition to the Policy's terms described herein, there also may be no coverage for the ARM Lawsuit, the Moderne Lawsuit, and the Arbitration based on other terms, conditions, endorsements, definitions, and/or exclusions, which TIC hereby reserves and does not waive.

### FIRST CLAIM FOR RELIEF
### (Declaratory Judgment of No Coverage Under the Policy – ARM)

64. TIC realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

65. The Policy applies to "property damage" only if caused by an "occurrence" that takes place at the "Designated Project Site" during the policy period, except for "property damage" included in the "products-completed operations hazard."

66. For "property damage" included in the "products-completed operations hazard," the Policy applies to "property damage" only if caused by an "occurrence" that takes place at the "Designated Project Site" during the policy period or during the "extended products-completed operations period."

67. The damages claimed in the ARM Lawsuit and the Arbitration do not qualify as "property damage," and are not caused by an "occurrence."

68. The allegations in the ARM Lawsuit / the Arbitration of defective workmanship standing alone do not constitute an "occurrence," and the repair of the alleged defective workmanship or product does not constitute "property damage."

69. The alleged damages incurred as a result of removing or repairing non-defective property to get to the faulty workmanship are not covered by the Policy to the extent such costs arise out of a claim for "property damage" that is not covered by the Policy.

70. To the extent it is shown that the damages claimed in the ARM Lawsuit and the Arbitration do qualify as "property damage" caused by an "occurrence" at the "Designated Project Site," coverage under the "products-completed operations hazard" of the Policy has not been triggered because the "Designated Project Site" was not issued a final certificate of occupancy prior to the expiration of the policy period.

71.    To the extent it is shown that completion did not occur in accordance with the definition of "products-completed operations hazard," the "property damage to the Designated Project Site during the course of construction" exclusion applies to preclude coverage for the damages claimed in the ARM Lawsuit and the Arbitration.

72.    The Policy states that it is excess over "[a]ny of the other insurance, whether primary, excess, contingent or on any other basis . . . [t]hat is Fire, Extended Coverage, Builder's Risk, Installation Risk, Construction All Risks (CAR), Erection All Risks, (EAR), Course of Construction (COC), Delay in Completion, Delay in Start Up (DSU), property inland marine, or similar coverage for 'your work.' "

73.    Subject to all other terms of the Policy, TIC does not have a duty to defend under Coverage A or B where the Policy is excess and where a builder's risk insurer has a duty to defend the insured, as a Named Insured, against the "suit."

74.    Upon information and belief, ARM obtained or was otherwise insured as a Named Insured under a "Builder's Risk" policy for "[ARM's] work" in connection with the "Designated Project Site," and that the other insurer has a duty to defend ARM under that policy.

75.    Therefore, and upon information and belief, TIC does not have a duty to defend ARM because the Policy is excess.

76.    Other terms, provisions, exclusions, limitations, or conditions of the Policy preclude and/or limit defense and/or indemnity coverage for the ARM Lawsuit and the Arbitration, including but not limited to the follow exclusions: the "expected or intended injury" exclusion, the "contractual liability" exclusion, the "damage to impaired property" exclusion, the "construction management errors and omissions" exclusion, and the "exterior insulation and finish systems" exclusion.

77.    TIC reserves the right to raise other terms, limitations, endorsements, exclusions and provisions of the Policy.

78.    TIC seeks a declaratory judgment, under 28 U.S.C. § 2201, that the allegations and/or claims for damages asserted in the ARM Lawsuit and the Arbitration are not covered or potentially covered, are limited, and/or excluded by the foregoing provisions, exclusions, endorsements, terms and conditions of the Policy; and therefore, TIC does not have, and never had, any duty to defend and/or indemnify ARM or any other purported insured or assignee of any insured under the Policy.

79.    TIC is entitled to an award of its attorneys' fees pursuant to A.R.S. § 12-341.01 because this matter arises out of contract.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment of No Coverage Under the Policy – MCP II Defendants)

80.    TIC realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

81.    The Policy applies to "property damage" only if caused by an "occurrence" that takes place at the "Designated Project Site" during the policy period, except for "property damage" included in the "products-completed operations hazard."

82.    For "property damage" included in the "products-completed operations hazard," the Policy applies to "property damage" only if caused by an "occurrence" that takes place at the "Designated Project Site" during the policy period or during the "extended products-completed operations period."

83.    The damages claimed in the Moderne Lawsuit and the Arbitration do not qualify as "property damage," and are not caused by an "occurrence."

84.    The allegations in the Moderne Lawsuit / the Arbitration of defective workmanship standing alone do not constitute an "occurrence," and the repair of the alleged defective workmanship or product does not constitute "property damage."

85.    The alleged damages incurred as a result of removing or repairing non-defective property to get to the faulty workmanship are not covered by the Policy to the extent such costs arise out of a claim for "property damage" that is not covered by the Policy.

86. To the extent it is shown that the damages claimed in the Moderne Lawsuit and the Arbitration do qualify as "property damage" caused by an "occurrence" at the "Designated Project Site," coverage under the "products-completed operations hazard" of the Policy has not been triggered because the "Designated Project Site" was not issued a final certificate of occupancy prior to the expiration of the policy period.

87. To the extent it is shown that completion did not occur in accordance with the definition of "products-completed operations hazard," the "property damage to the Designated Project Site during the course of construction" exclusion applies to preclude coverage for the damages claimed in the Moderne Lawsuit and the Arbitration.

88. The "Cross Suit Liability" exclusion also precludes coverage for the claims asserted against the MCP II Defendants by Trimod in the Moderne Lawsuit and the Arbitration.

89. In addition, the "construction management errors and omissions" exclusion precludes coverage for the claims asserted against the MCP II Defendants by Trimod in the Moderne Lawsuit and the Arbitration.

90. Other terms, provisions, exclusions, limitations, or conditions of the Policy preclude and/or limit defense and/or indemnity coverage for the Moderne Lawsuit and the Arbitration, including but not limited to the follow exclusions: the "expected or intended injury" exclusion, the "contractual liability" exclusion, the "damage to impaired property" exclusion, and the "exterior insulation and finish systems" exclusion.

91. TIC reserves the right to raise other terms, limitations, endorsements, exclusions and provisions of the Policy.

92. TIC seeks a declaratory judgment, under 28 U.S.C. § 2201, that the allegations and/or claims for damages asserted in the Moderne Lawsuit and the Arbitration are not covered or potentially covered, are limited, and/or excluded by the foregoing provisions, exclusions, endorsements, terms and conditions of the Policy; and therefore, TIC does not have, and never had, any duty to defend and/or indemnify the MCP II Defendants or any other purported insured or assignee of any insured.

93. TIC is entitled to an award of its attorneys' fees pursuant to A.R.S. § 12-341.01 because this matter arises out of contract.

WHEREFORE, TIC respectfully requests the following affirmative relief and declaration that:

A. The Policy does not provide coverage for the Moderne Lawsuit, the ARM Lawsuit, and the Arbitration;

B. TIC has no duty to defend Defendant ARM with respect to the ARM Lawsuit and the Arbitration;

C. TIC has no duty to defend the MCP II Defendants with respect to the Moderne Lawsuit and the Arbitration;

D. TIC has no duty to indemnify Defendant ARM with respect to the ARM Lawsuit and the Arbitration;

E. TIC has no duty to indemnify the MCP II Defendants with respect to the Moderne Lawsuit and the Arbitration;

F. TIC has no duty to pay defense expenses incurred by or on behalf of Defendant ARM or any other party in the ARM Lawsuit and the Arbitration;

G. TIC has no duty to pay defense expenses incurred by or on behalf of the MCP II Defendants or any other party in the Moderne Lawsuit and the Arbitration;

H. TIC is entitled to its attorneys' fees pursuant to A.R.S. § 12-341.01 and its costs pursuant to A.R.S. §12-341 as incurred in this action; and

I. TIC is entitled to such other and further relief as a matter of law or equity, as the Court deems just, necessary, and proper.

RESPECTFULLY SUBMITTED this 13th day of July, 2026.

**SANDERS & PARKS, P.C.**


By /s/ J. Steven Sparks
   J. Steven Sparks
   John C. Quinn
   3030 North Third Street, Suite 1300
   Phoenix, AZ  85012-3099
   *Attorneys for Plaintiff Texas Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing thereby transmitting a Notice of Electronic Filing to all CM/ECF registrants.


By:  *s/ L. Chiappetta*